IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

NORTHWEST ENVIRONMENTAL          )
DEFENSE CENTER, an Oregon nonprofit  )
corporation,                     )
                                 )
              Plaintiff,          )          Civil Case No. 06-1270-KI
                                 )
     vs.                        )          OPINION AND ORDER
                                 )
MARVIN BROWN, Oregon State Forester, )
in his official capacity; STEPHEN HOBBS, )
BARBARA CRAIG, DIANE SNYDER,     )
LARRY GIUSTINA, CHRIS            )
HEFFERNAN, WILLIAM HUTCHISON     )
and JENNIFER PHILLIPPI, members of  )
the Oregon Board of Forestry, in their  )
official capacities; HAMPTON TREE  )
FARMS, INC., an Oregon domestic  )
business corporation; STIMSON LUMBER  )
COMPANY, an Oregon domestic business  )
corporation; GEORGIA-PACIFIC WEST,  )
INC., an Oregon domestic business  )
corporation; and SWANSON GROUP,  )
INC., an Oregon business corporation,  )
                                 )
            Defendants.         )
_____  )

Page 1 - OPINION AND ORDER

and                                       )
                                          )
OREGON FOREST INDUSTRIES                  )
COUNCIL, an Oregon nonprofit              )
corporation; and AMERICAN FOREST          )
AND PAPER ASSOCIATION, a Delaware         )
nonprofit corporation,                    )
                                          )
                          Intervenors,    )

Christopher G. Winter
Ralph O. Bloemers
Cascade Resources Advocacy Group
917 S.W. Oak Street, Suite 417
Portland, Oregon  97205

Paul August Kampmeier
Washington Forest Law Center
615 Second Avenue, Suite 360
Seattle, Washington  98104

      Attorneys for Plaintiff

Marc Abrams
State of Oregon
1162 Court Street, N.E.
Salem, Oregon  97301

      Attorney for State Defendants

J. Mark Morford
Louis A. Ferreira, IV
Per A. Ramfjord
Stoel Rives, LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon  97204

      Attorneys for Forest Products Defendants and Trade Association Intervenors

William K. Sargent
1134 Main Avenue
Tillamook, Oregon  97141

      Attorney for Intervenor Defendant Tillamook County

Page 2 - OPINION AND ORDER

Ellen Steen
Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595

      Attorney for Intervenor American Forest and Paper Association

Bradford Thomas McLane
U.S. Department of Justice
950 Pennsylvania Avenue, N.W., Room 2618
Washington, D.C.  20530

      Amicus Advisor


KING, Judge:

Plaintiff Northwest Environmental Defense Center ("NEDC") brings this action under the Clean Water Act ("CWA") concerning discharges of stormwater from ditches alongside logging roads in the Tillamook State Forest.  NEDC seeks to require defendants to obtain National Pollutant Discharge Elimination System ("NPDES") permits, which NEDC contends are required by the CWA in this situation.  Before the court are State Defendants' (Marvin Brown, Oregon State Forester, and members of the Oregon Board of Forestry, Stephen Hobbs, Barbara Craig, Diane Snyder, Larry Giustina, Chris Heffernan, William Hutchison, and Jennifer Phillippi) Motion to Dismiss (#16) and Forest Products Defendants' (timber companies Hampton Tree Farms, Inc., Stimson Lumber Company, Georgia-Pacific West, Inc., and Swanson Group, Inc., along with intervenors Oregon Forest Industries Council and American Forest and Paper Association) Motion to Dismiss First Amended Complaint (#21).  The United States filed an amicus curiae brief.  For the reasons below, I dismiss the First Amended Complaint.

## ALLEGATIONS

The logging roads at issue in the Tillamook State Forest are the Trask River Road, running along the South Fork Trask River, and the Sam Downs Road, running along the Little South Fork of the Kilchis River. Ditches, channels, and culverts associated with logging roads often deliver collected stormwater into existing streams and rivers. The stormwater, polluted with sediment and other pollutants, degrades water quality and adversely impacts aquatic life. The discharges on these two roads are not authorized by NPDES permits. The State Defendants own and control the logging roads. The Forest Product Defendants haul timber on the roads and are contractually obligated to maintain the roads. According to NEDC, defendants violated the CWA by discharging pollutants and/or industrial stormwater from point sources along the Trask River Road and Sam Downs Road to waters of the United States without NPDES permits.

## LEGAL STANDARDS

A motion to dismiss under Rule 12(b)(6) will only be granted if it "appears beyond doubt that the plaintiff can prove no set of facts in support of his complaint which would entitle him to relief." Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005) (internal quotation omitted). Normally, the review is limited to the complaint, and all allegations of material fact are taken as true and viewed in the light most favorable to the non-moving party. Id. The court is not required to accept "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 972 (9th Cir. 2004), cert. denied, 544 U.S. 974 (2005). The court may also review a document extrinsic to the complaint if the authenticity of the document is not contested and the document is integral to the claims. Fields v. Legacy Health System, 413 F.3d 943, 958 n.13 (9th Cir. 2005). A second

exception is that a court may take judicial notice of matters of public record.  Lee v. City of Los
Angeles, 250 F.3d 668, 688-89 (9th Cir. 2001).

## DISCUSSION

I.    Standing

       The State Defendants contend that NEDC has not sufficiently alleged facts to maintain its

representational standing.

       NEDC alleges that it is a nonprofit corporation with the mission to protect and conserve

the environmental and natural resources of the Pacific Northwest.  Its members derive aesthetic,

recreational, and other benefits from Oregon's waterways, including the rivers and tributaries

near the Trask River Road and Sam Downs Road.  NEDC members use and enjoy the Trask and

Kilchis rivers, and their tributary waters, for fishing and other recreational activities.  NEDC

alleges that it has at least one member who is injured by defendants' discharge of pollutants and

stormwater.

       The State Defendants contend that this allegation is generic and insufficiently concrete

and particularized to satisfy standing requirements because the allegation does not identify any

specific members.  NEDC argues that its allegations are sufficient, specifically, that it does not

need to identify a particular member in the complaint but can provide that information during

discovery in a manner designed to protect the privacy interest of its members.

              An organization has standing to bring suit on behalf of its members when:
       (a) its members would otherwise have standing to sue in their own right; (b) the
       interests it seeks to protect are germane to the organizations's purposes; and (c)
       neither the claim asserted nor the relief requested requires the participation
       individual members in the lawsuit.  Individual members would have standing in
       their own right under Article III if "they have suffered an 'injury in fact' that is (a)
       concrete and particularized and (b) actual and imminent, not conjectural or
       hypothetical, . . . the injury is fairly traceable to the challenged action of the

defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Laidlaw</u>, 120 S. Ct. at 704 (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).

<u>Ecological Rights Foundation v. Pacific Lumber Co.</u>, 230 F.3d 1141, 1147 (9th Cir. 2000) (some internal citations omitted).  The "injury in fact" requirement in environmental cases is met if an individual "adequately shows that she has an aesthetic or recreational interest in a particular place, or animal, or plant species and that that interest is impaired by a defendant's conduct." <u>Id.</u>

Here, the assertion of CWA protection for the rivers and tributaries near the logging roads is germane to NEDC's purpose.  There is also no argument by defendants that an individual member's participation in the suit is necessary.  The dispute centers on whether an individual member has suffered an "injury in fact."  The general allegation is that individual NEDC members use the two rivers for recreation and at least one member has been injured by the discharges.

Most of the cases cited by defendants, including <u>Ecological Rights</u>, hash out this issue in a motion for summary judgment when there is an evidentiary record, typically in the form of a declaration from an individual member explaining their particular use of the area and injury suffered by the environmental harm.  Because this is a motion to dismiss, there is no such declaration.  I agree with NEDC that its allegations are sufficient for standing purposes.  In particular, it does not appear beyond doubt that NEDC can prove no set of facts in support of its complaint which would entitle it to relief.  In a case which survives a motion to dismiss, a particular member can be identified during discovery and the issue raised again in a motion for summary judgment if defendants still believe that standing does not exist.  I acknowledge that the court in <u>Arbor Hill Concerned Citizens Neighborhood Ass'n v. City of Albany, New York</u>, 250

F. Supp. 2d 48 (N.D.N.Y. 2003), concluded differently and granted a motion to dismiss for lack

of standing based on a citizen group's complaint with similar general environmental allegations

but no individual members identified.  I am unpersuaded by Arbor Hill's analysis.

I conclude that the allegations concerning standing are sufficiently pled and do not need

to be proven for a particular individual until the summary judgment stage of the proceeding.

II.    Viability of a Citizen Suit

The State Defendants contend that NEDC fails to satisfy the CWA's procedural

prerequisites to a citizen suit under 33 U.S.C. § 1365.

Under the CWA, a citizen may bring an action against any person "who is alleged to be in

violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the

Administrator of a State with respect to such a standard or limitation."  33 U.S.C. § 1365(a)(1).

NEDC contends that its allegations that defendants discharged pollutants or industrial

stormwater without a valid NPDES permit fall within the statutory limits of a citizen suit.  NEDC

notes that the CWA definition of effluent standard or limitation includes an unlawful act under

§ 1311(a).  33 U.S.C. § 1365(f)(1).  Section 1311(a), in turn, makes it unlawful to discharge any

pollutant except in compliance with the NPDES permit required by § 1342, among other things.

NEDC thus argues that a citizen suit to enforce an "effluent limitation" can be based on

allegations that the defendant is discharging without an NPDES permit.  NEDC also relies on

Ass'n to Protect Hammersly, Eld and Totten Inlets v. Taylor Resources, 299 F.3d 1007 (9th Cir.

2002) [hereinafter APHETI], to argue that citizens may bring suit to require a permit.

Based on NEDC's argument, the State Defendants note that NEDC neither asserts a

violation of an order nor identifies a standard allegedly violated.  Thus, the issue is limited to

whether NEDC properly identified an effluent limitation that has been violated. Briefly, the State

Defendants contend that Congress did not require permits for all stormwater dischargers and the

EPA has determined that regulatory action is not needed. The State Defendants rely on

33 U.S.C. § 1342(p), contending that it expressly excludes any point source stormwater

discharges at issue here from coverage under the NPDES program until such time as EPA

decides to regulate them.

The State Defendants distinguish <u>APHETI</u> because it concerned a discharge from

aquaculture, which is not expressly addressed in the CWA, unlike the stormwater at issue here.

Furthermore, the State Defendants contend that NEDC's quote from <u>APHETI</u> was on the issue of

whether citizen suits are "stop gaps," precluded in areas in which federal or state regulation is

active. The State Defendants contend that issue is irrelevant to the case here.

In <u>APHETI</u>, a citizen group brought suit contending that a mussel-harvesting company

operating in Puget Sound violated the CWA by discharging pollutants, namely the biological

materials emitted from the mussels, without an NPDES permit. The state agency that

administered the NPDES permit program had determined that a permit was not required. The

court allowed the citizen suit to continue, stating:

> Although the EPA or an authorized state agency may be charged with
> enforcement of the Clean Water Act, neither the text of the Act nor its legislative
> history expressly grants to the EPA or such a state agency the exclusive authority
> to decide whether the release of a substance into the waters of the United States
> violates the Clean Water Act.

<u>Id.</u> at 1012.

I see nothing distinguishing the case before me that makes this statement any less true. I

conclude that NEDC is not barred from bringing this citizen suit.

III.    NPDES Permit Requirement

    A.    Statutory and Regulatory Background

Section 301(a) of the CWA prohibits the discharge of any pollutant into the waters of the

United States except in compliance with several provisions, including NPDES permits.

33 U.S.C. § 1311; 33 U.S.C. § 1342.  NPDES requirements are violated if a defendant discharges

a pollutant to navigable waters from a point source.  Headwaters, Inc. v. Talent Irrigation Dist.,

243 F.3d 526, 532 (9th Cir. 2001).  A few definitions:

> The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

33 U.S.C. § 1362(6).

> The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged.  This term does not include agricultural stormwater discharges and return flows from irrigated agriculture.

33 U.S.C. § 1362(14).

The CWA was amended in 1987 to add Section 402(p), which enacted a two-phase

regulatory program for stormwater.  Phase I imposed a general moratorium on the issuance of

NPDES permits to discharges composed entirely of stormwater until October 1, 1994.  33 U.S.C.

§ 1342(p)(1).  Five categories of stormwater discharges were excepted from the moratorium and

are known as Phase I discharges.  33 U.S.C. § 1342(p)(2).

Phase I discharges include:  (1) a discharge for which a permit was issued before

February 4, 1987; (2) a discharge associated with industrial activity; (3) a discharge from a

Page 9 - OPINION AND ORDER

municipal separate storm sewer system serving a population of 250,000 or more; (4) a discharge from a municipal separate storm sewer system serving a population between 100,000 and 250,000; and (5) a discharge for which EPA or the state determines contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States. Id. Phase I discharges require NPDES permits.  33 U.S.C. § 1342(p)(3).

Section 402(p) also directed EPA to study stormwater discharges, the extent of pollutants in them, and methods to control them to the extent necessary to mitigate impacts on water quality.  EPA was required to issue regulations to designate stormwater discharges, other than the Phase I discharges, and to establish a program to regulate them as necessary to protect water quality.  33 U.S.C. § 1342(p)(5)-(6).  These are known as Phase II discharges.  In 1999, EPA issued the final Phase II stormwater regulations which designated two additional categories of stormwater discharges that required NPDES permits:  (1) municipal separate storm sewer systems (MS4s) serving less than 100,000 people; and (2) construction sites that disturb one to five acres of land.  40 C.F.R. § 122.26(a)(9)(I).

B.    NEDC's Theories of Liability

NEDC has two theories of liability.  The first theory is that the discharges at issue are regulated under Phase I as point source stormwater discharges associated with industrial activity, namely facilities within Standard Industrial Classification ("SIC") 24 (lumber and wood products) and SIC 2411 (logging).  Because the Ninth Circuit held that the silvicultural regulation, 40 C.F.R. § 122.27, does not exempt point source discharges from the NPDES program, and since no other exclusions from the Phase I rule apply, NEDC argues that defendants must obtain NPDES permits for the point source discharges along their haul routes.

Page 10 - OPINION AND ORDER

NEDC's alternative theory notes that the Ninth Circuit recently invalidated, as applied to forest roads, the NPDES permit exemption for unregulated stormwater discharges codified at 40 C.F.R. § 122.26(a)(9)(I).  According to NEDC, this means that any discharge of pollutants from the forest roads at issue remain subject to and prohibited by Section 301(a) unless authorized by an NPDES permit.

C.    Application of Section 402(p) to Stormwater Discharges on Forest Roads

Section 402(p) requires an NPDES permit for discharges associated with industrial activity, one of the so-called Phase I discharges.  33 U.S.C. § 1342(p)(2)(B).

In 1980, EPA promulgated the current silvicultural[1] point source regulation defining those silvicultural activities that constitute point sources and those that constitute nonpoint sources.

> Silvicultural point source means any discernible, confined and discrete conveyance related to rock crushing, gravel washing, log sorting, or log storage facilities which are operated in connection with silvicultural activities and from which pollutants are discharged into waters of the United States.  The term does not include nonpoint source silvicultural activities such as nursery operations, site preparation, reforestation and subsequent cultural treatment, thinning, prescribed burning, pest and fire control, harvesting operations, surface drainage, or road construction and maintenance from which there is natural runoff.  However, some of these activities (such as stream crossing for roads) may involve point source discharges of dredged or fill material which may require a CWA section 404 permit (See 33 CFR 209.120 and part 233).

40 C.F.R. § 122.27(b)(1).

Defendants contend that the timber harvesting activities and use of the logging roads fall within this exception and thus require no permit.  They also note that timber harvesting operations are expressly defined to be a nonpoint source activity in the regulation.  Defendants

---

[1]  Silviculture:  a branch of forestry dealing with the development and care of forests. Merriam-Webster's Online Dictionary (Jan. 8, 2007), http://www.m-w.com/cgi-bin/dictionary?book=Dictionary&va=silvicultural.

contend that <u>League of Wilderness Defenders v. Forsgren</u>, 309 F.3d 1181 (9th Cir. 2002),

supports the proposition that natural runoff includes runoff channeled by forest roads.

NEDC contends that <u>Forsgren</u> limited the scope of the permit exemption in 40 C.F.R.

§ 122.27(a) to cases in which there is natural runoff or nonpoint source pollution, which NEDC

argues is not the case for the forest roads at issue.

Defendants dispute NEDC's interpretation of <u>Forsgren</u> and contend that in finding that

the regulatory list of silvicultural point sources is not exhaustive and that the aerial discharges in

question were point sources, the court did not invalidate the portion of the regulation classifying

runoff from harvesting operations, surface drainage and road construction and maintenance as

nonpoint sources.

The State Defendants contend that the logging roads do not qualify as point sources under

the reasoning in <u>Forsgren</u>.  They argue that <u>Forsgren</u> rejected the contention that every road is a

point source requiring an NPDES permit because of the residue left on the roads by vehicles

which mixes with the stormwater.  Instead, <u>Forsgren</u> supports the argument that forestry roads

from which there is natural runoff are nonpoint sources of pollution.

NEDC contends that it has alleged that the "ditches, culverts, channels, pipes and other

mechanisms" on both roads are point sources.  According to NEDC, the State Defendants

unpersuasively stretch dicta found in <u>Forsgren</u>, a case about the aerial application of pesticides.

In <u>Forsgren</u>, plaintiffs contended that the United States Forest Service violated the CWA

by instituting an aerial insecticide spraying program over national forest lands without obtaining

an NPDES permit.  All agreed that the aerial spraying program met all elements of the definition

for point source pollution.  The Forest Service relied on the silvicultural exemption, arguing that

the aerial spraying was a silvicultural pest control activity, defined by the silvicultural exemption

as a nonpoint source.  Id. at 1182-85.  The court explained:

> Although nonpoint source pollution is not statutorily defined, it is widely
> understood to be the type of pollution that arises from many dispersed activities
> over large areas, and is not traceable to any single discrete source.  Because it
> arises in such a diffuse way, it is very difficult to regulate through individual
> permits.  The most common example of nonpoint source pollution is the residue
> left on roadways by automobiles.  . . .  When it rains, the rubber particles and
> copper dust [from brake linings] and gas and oil wash off of the streets and are
> carried along by runoff in a polluted soup, winding up in creeks, rivers, bays, and
> the ocean.  Nonpoint source pollution of this kind is the largest source of water
> pollution in the United States, far outstripping point source pollution from
> factories, sewage plants, and chemical spills.

Id. at 1184.

The court reasoned that the statutory definition of point source was unambiguous and that

the Forest Service "cannot contravene the will of Congress through its reading of administrative

regulations."  Id. at 1185-86.  The court applied the modifying phrase, "from which there is

natural runoff," to all the activities listed in the sentence.  Thus, it held that "the regulation

excludes from the definition of point source pollution only those silvicultural pest control

activities *from which there is natural runoff*, rather than *all* silvicultural pest control activities."

Id. at 1186 (emphasis in the original).  The court also noted that "nonpoint source pollution

involves runoff that picks up scattered pollutants and washes them into water bodies."  Id.

Applying this interpretation to the spraying program, the court concluded:  "Because discharging

pesticide from aircraft directly over covered waters has nothing to do with runoff, it is not a

nonpoint source activity."  Id. at 1187.

Turning to the first sentence in the silvicultural exemption, the court held that the four

activities listed (rock crushing, gravel washing, log sorting, or log storage facilities) are not an

exhaustive list of point source activities associated with silviculture. Id. at 1188. In conclusion, the court held that the aerial spraying program was a point source that required an NPDES permit. Id.

Forsgren is clearly controlling here. Some of the cases cited by the parties are not persuasive because they are pre-Forsgren and consider the list of point sources in the exemption to be exhaustive. See Newton County Wildlife Ass'n v. Rogers, 141 F.3d 803, 810 (8th Cir. 1998); O'Aha'Ino v. Galiher, 28 F. Supp. 2d 1258, 1261 (D. Haw. 1998). Another case, North Carolina Shellfish Growers Ass'n v. Holly Ridge Assocs., 278 F. Supp. 2d 654, 681 (E.D.N.C. 2003) ("The . . . Tract contains an extensive network of seventeen ditches specifically designed to concentrate and accelerate the flow of stormwater from the Tract. It is difficult to imagine how drainage from such a network could be deemed 'natural runoff . . . .'"), makes a brief statement without analysis and thus lacks persuasive power.

Based on Forsgren, we know that the term silvicultural point source does not include nonpoint source silvicultural activities of harvesting operations from which there is natural runoff, surface drainage from which there is natural runoff, and road construction and maintenance from which there is natural runoff. NEDC alleges that the point source activities are the building and maintenance of the forest roads and the hauling of timber on the roads. Under § 122.27(b)(1) as interpreted by Forsgren, those activities are not point sources when the natural runoff flows into the waters of the United States. We also know from Forsgren that "nonpoint source pollution involves runoff that picks up scattered pollutants and washes them into water bodies." Id. at 1186. Thus, the fact that pollutants deposited on top of the roads during timber hauling end up being washed into the water bodies does not turn the road system

with its associated ditches and culverts into a point source.  The road/ditch/culvert system and timber hauling on it is a traditional dispersed activity from which pollution flowing into the water cannot be traced to single discrete sources.  <u>See</u> <u>id.</u> at 1184.  The activities complained of here are a far cry from the act complained of in <u>Forsgren</u>, namely, spraying pesticide from an airplane.

NEDC also relies on <u>Environmental Protection Information Center v. Pacific Lumber Co.</u>, No. C01-2821-MHP (N.D. Cal. Oct. 14, 2003) [hereinafter EPIC], to argue that the exemption in 40 C.F.R. § 122.27 cannot encompass things which fall within the statutory definition of point source.  NEDC also contends that EPIC holds that water collected by the timber company's stormwater system was not natural runoff from nonpoint source silvicultural activities.  Based on <u>EPIC</u> and <u>Forsgren</u>, NEDC argues that 40 C.F.R. § 122.27 does not exempt from the NPDES permit requirement any point source discharge of stormwater associated with silvicultural activities because polluted stormwater that is collected and conveyed to rivers and streams is not natural runoff but rather a point source discharge requiring an NPDES permit.

The United States contends that EPIC was wrongly decided when the court declined to defer to the EPA's interpretation of its regulations.  An agency's interpretation of its own ambiguous regulation is controlling unless the interpretation is "plainly erroneous or inconsistent with the regulation."  <u>Auer v. Robbins</u>, 519 U.S. 452, 461, 117 S. Ct. 905 (1997).

I reviewed <u>EPIC</u> and its statement that

the type of "harvesting operations, surface drainage, or road construction and maintenance from which there is natural runoff" identified in section 122.27 cannot encompass the ditches, culverts, channels, and gullies otherwise deemed 'point sources' under section 502(14).  Such ditches and culverts fall within section 502(14)'s "point source" category, and section 122.27 cannot alter or modify this definition.

Id. at 19-20 (internal citations omitted).  I am unconvinced, however, and believe that EPIC was wrongly decided.  It contradicts Forsgren's explanation of traditional sources of nonpoint source pollution.

Because I conclude that the silvicultural exemption applies, there is no need to address the parties' arguments about whether there is a Phase I discharge associated with industrial activity.  I dismiss the § 402(p) claim.

D.      Application of Section 301(a) to Stormwater Discharges on Forest Roads

NEDC argues that if the discharges here are not regulated by Section 402(p), 33 U.S.C. § 1342(p), and the Phase I rules, then the discharges require a permit under Section 301, 33 U.S.C. § 1311.  NEDC bases this argument on Environmental Defense Center v. EPA, 344 F.3d 832 (9th Cir. 2003) [hereinafter EDC], cert. denied, 541 U.S. 1085 (2004) contending that the Ninth Circuit rejected EPA's attempt to exempt forest roads from regulation.  According to NEDC:

> Since the apparent exemption for forest roads was at the heart of what EPA was told to reconsider, the Phase II exemption does not and cannot exempt stormwater discharges from forest roads from the NPDES permit requirement until EPA has addressed the remand.
>
>           . . . .
>
>           . . . Since the moratorium expired on October 1, 1994, and since EPA has not issued a valid Phase II exemption for stormwater discharges from forest roads, those discharges remain subject to Section 301(a)'s general prohibition on the "discharge of pollutants."

Pl.'s Opp'n to Industry's Mot. to Dismiss at 27-28.

Defendants contend that in EDC, the court rejected the contention that EPA was required to designate forest roads as sources of stormwater pollution and remanded the issue of whether

all stormwater discharges required NPDES permits on procedural, not substantive, grounds. According to Defendants, the remand did not create a regulation but instead restored the status quo, which was no regulation of stormwater on forest roads.

In EDC, the Ninth Circuit consolidated three cases which raised 22 constitutional, statutory, and procedural challenges to the Phase II stormwater rule EPA issued in October 1999. In part, Petitioners contended that EPA arbitrarily failed to regulate forest roads under the Phase II rule despite clear evidence of the need for pollution control of the stormwater drainage from those roads. Id. at 860-61. EPA raised several procedural arguments but "[did] not seriously address the merits of Petitioners' objections." Id. at 862. The court held:

> Having concluded that the objections of the Environmental Petitioners are not time-barred, and that we have jurisdiction to hear them, but that EPA failed to consider those objections on the merits, we remand this issue to the EPA, so that it may consider in an appropriate proceeding Petitioners' contention that § 402(p)(6) requires EPA to regulate forest roads. EPA may then either accept Petitioners' arguments in whole or in part, or reject them on the basis of valid reasons that are adequately set forth to permit judicial review.

Id. at 863. In conclusion, the court noted its remand of the forest road issue as well as two other issues and stated: "We affirm all other aspects of the Phase II rule against the statutory, administrative, and constitutional challenges raised in this action." Id. at 879.

For the most part, the Ninth Circuit affirmed the Phase II rule. The remand was for limited purposes. The Phase II rule did not set up exemptions, it named additional areas requiring NPDES permits. It does not follow from the Ninth Circuit holding in EDC that permits are now required for forest roads while the EPA addresses Petitioners' objections about the lack of regulation on the merits.

This interpretation of the regulatory scheme has been followed in other courts.  In

Conservation Law Foundation v. Hannaford Bros. Co., 327 F. Supp. 2d 325 (D. Ver. 2004), the

court held that a shopping plaza owner did not violate § 301(a) for failing to obtain an NPDES

permit for stormwater discharge off the parking lot.  Id. at 331-32.  The plaintiff contended that

§ 301(a)'s prohibition on all stormwater discharges without permits again became law once the

permit moratorium expired on October 1, 1994.  The court stated:

> [Plaintiff] may be correct that upon the expiration of the permit
> moratorium all stormwater discharges without permits were in violation of
> § 301(a).  This is because EPA did not issue the Phase II rules until December 8,
> 1999 and they did not become effective until February 7, 2000.  Thus, it could be
> argued that during the more than five-year period between the end of the
> moratorium and the effective date of the Phase II rules, all stormwater discharges
> without a permit, including the Burlington Plaza, were subject to the permit
> requirement and were violating § 301(a).
>
> The court need not address this question, however.  As discussed, the plain
> language of § 402(p) authorizes EPA to issue regulations designating which
> stormwater discharges are to be regulated and which are to be left unregulated.
> When those Phase II regulations went into effect, a stormwater discharge left
> unregulated fell into compliance with § 402(p) unless EPA or an authorized state
> agency later exercised its residual designation authority to require an NPDES
> permit for that discharge.  A stormwater discharge that complies with § 402(p)
> does not violate § 301(a).

Id. at 331 (internal citation omitted).[2]

Accordingly, the motion to dismiss the § 301(a) claim is granted.

---

[2]  I realize that NEDC alleges that the stormwater discharges are Phase I discharges and
the plaintiff in Hannaford did not make a similar allegation.  NEDC's allegation, however, is a
legal conclusion and not an allegation of a material fact that I must accept as true.

IV.    <u>Amendment</u>

NEDC seeks leave to amend its complaint if I grant the motion to dismiss but does not explain what additional facts can be alleged.  I can think of none that will change this analysis and conclude that any amendment is futile.

## CONCLUSION

Plaintiff's Request for Judicial Notice (#47) is granted.[3]  State Defendants' Motion to Dismiss (#16) and Forest Products Defendants' Motion to Dismiss First Amended Complaint (#21) are granted.

IT IS SO ORDERED.

Dated this _____1st_____ day of March, 2007.


   /s/ Garr M. King
Garr M. King
United States District Judge

---

[3]  Several parties requested judicial notice of several exhibits without drawing objection. I grant all such requests.  Plaintiff objected to Exhibits 2 through 4 filed by the Forest Product Defendants.  The exhibits are portions of briefs filed by the United States in other cases.  The Forest Product Defendants relied on the exhibits as evidence of the position of the federal agency charged with interpreting the CWA.  Because the United States filed an amicus curiae brief in this action, I will rely on that as the statement of the agency's position and decline to take judicial notice of Exhibits 2 through 4.